**STATE of Iowa, Appellee,**

v.

**Madonna KASEL, Appellant.**

**No. 90–1937.**

Supreme Court of Iowa.

July 22, 1992.

Linda Del Gallo, State Appellate Defender, and Shari Barron, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Sheryl A. Soich, Asst. Atty. Gen., Karl J. Horn, County Atty., and Ralph A. Smith, Asst. County Atty., for appellee.

Considered by McGIVERIN, C.J., and CARTER, NEUMAN, SNELL and ANDREASEN, JJ.

NEUMAN, Justice.

A jury convicted Madonna Kasel of second-degree sexual abuse, a violation of Iowa Code sections 709.1 and 709.3(2) (1989). The conviction stems from allegations that Kasel sexually abused a seven-year-old boy for whom she had been regularly baby-sitting. On appeal, Kasel mounts constitutional challenges to the admissibility of statements made in custody, and the closed-circuit television transmission of the victim's testimony outside her presence. We reverse and remand for new trial.

Kasel became the subject of a child abuse investigation after one of her four-year-old charges, M.Z., was overheard telling her seven-year-old brother, S.Z., "I would like your wiener, can I suck it?" The children's mother asked where the children had heard such a thing, to which M.Z. reportedly replied, "Madonna does it." Further conversation with S.Z. led his parents and child abuse investigators to believe he had been the victim of repeated sex acts while in Kasel's care.

Kasel was asked by Floyd County Sheriff's Deputy William Cavanaugh to come in for questioning concerning the Z. children. She did so, accompanied by her mother.

Although Kasel was twenty-two years old at the time, and a high school graduate, it appears that she is a person of somewhat limited abilities. She had been enrolled in special education classes in school. Obviously dependent on her parents, she had been able to maintain jobs, other than baby-sitting, for only a short time since graduation.

While Kasel's mother waited in another room, Officer Cavanaugh conducted the interrogation. Accompanying the officer was Mary Harle, a child protection worker for the department of human services. Cavanaugh gave Kasel the standard *Miranda* warnings and also told her she was free to leave at any time. Kasel apparently consented to talk but refused to sign the written *Miranda* waiver form.

Cavanaugh generally described S.Z.'s allegations, to which Kasel replied, "That's sick. I didn't do it." Cavanaugh then revealed more details, telling Kasel the children were very credible, and inviting her to take a polygraph examination. Kasel responded by storming out of the room, opening the door with such force that it struck the chair on which Harle was sitting. Cavanaugh pursued Kasel down the hall, grabbing her arm and telling her, "The rules have changed." He led her back to the interrogation room, advising her she could be prosecuted for assaulting Harle.

No further *Miranda* advisory was given. Kasel, now upset and crying, said she would tell Cavanaugh and Harle what happened if they would stop taking notes and if she could go home with her mother. With this concession, she confessed to the sex acts reported by S.Z. When Cavanaugh contacted her the next day, however, she denied having made the confession or committing any sexual abuse.

Prior to trial Kasel moved to suppress the confession on fifth and fourteenth amendment grounds. She also resisted, on sixth amendment grounds, a protective order that permitted S.Z. to testify against her by closed-circuit television. The State prevailed on both motions and now, following conviction, Kasel cites error in the rulings to support her argument for reversal.

I. *Motion to suppress.* Kasel's motion to suppress alleged that the inculpatory statements given by her at the police station were obtained without a voluntary waiver of her *Miranda* rights. The district court overruled the motion, concluding that she voluntarily "reopened the questioning procedures" after attempting to leave the interrogation room. On appeal, Kasel asserts that, contrary to the holding of *Miranda,* she was not allowed to invoke her right to silence and she was then misled by the investigating officer concerning her rights. From our de novo review of the record, *see State v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975), we must agree.

 Preliminarily we note that concern over the State's need to give *Miranda* warnings—or the sufficiency of a defendant's waiver of them—arises only upon proof of both custody and interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966); *State v. Davis,* 446 N.W.2d 785, 788 (Iowa 1989). Here that dual test is complicated by the fact that Officer Cavanaugh coupled the standard *Miranda* warnings with his assurance that Kasel was free to leave at any time. At that point she had not been "taken into custody or otherwise deprived of [her] freedom in any way." *Davis,* 446 N.W.2d at 788 (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706). From this premise the State asserts no *Miranda* warnings were required and, arguably, the sufficiency of any waiver becomes irrelevant. *See id.* (because *Miranda* not implicated, no need to analyze whether waiver of rights was knowing, intelligent and voluntary).

Once Kasel left the room, however, and Officer Cavanaugh forcibly retrieved her with a warning that "the rules have changed," the State cannot seriously deny that its obligations under *Miranda* were triggered. The status of the interrogation clearly shifted from noncustodial to custodial. The State was either obliged to renew the *Miranda* warnings or honor those previously given.

Tacitly conceding this state of affairs, the State's only response is that, by leaving

the interrogation room, Kasel "did not invoke her right to silence." In other words, the State claims that no violation of *Miranda*'s prophylactic rule occurs unless a defendant verbalizes a desire to remain silent. Evasive conduct, it argues, is insufficient.

We are convinced that the State's narrow view of *Miranda*'s proscription is belied by that opinion's own words:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723.

■ To counteract the "coercive pressures of the custodial setting" and insure faithful adherence to the dictates of *Miranda*, a suspect's right to cut off questioning must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975); *State v. Snethen*, 245 N.W.2d 308, 314 (Iowa 1976). Kasel's privilege against self-incrimination was clearly not honored here. Her obvious attempt to end the interrogation and rejoin her mother was met with a firm rebuke and physical restraint. Without making it plain just how "the rules had changed," Officer Cavanaugh immediately returned her to the interrogation setting where she quickly broke down. Under these circumstances, *Miranda* dictates that Kasel's subsequent statements—even if voluntary—must be suppressed upon her motion because they were obtained in violation of her right to remain silent. *Mosley*, 423 U.S. at 99–100, 96 S.Ct. at 324–25, 46

L.Ed.2d at 319. The district court erred by failing to do so.

■ II. *Protective order.* Over Kasel's objection, the State obtained a protective order that permitted S.Z.'s trial testimony to be taken outside the defendant's presence via closed-circuit television. Pursuant to this order, S.Z. gave his testimony from the courthouse library. Present with him were the judge and both counsel. Kasel was sequestered in the judge's chambers. The jury remained in the courtroom. Both Kasel and the jury could see and hear S.Z. by means of the television monitor. But Kasel and her counsel had no means of communicating during the testimony.

On appeal, Kasel renews her challenge to the court's order on sixth amendment grounds. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."). Specifically she asserts that (1) there is no statutory authority for the procedure outlined above, (2) the arrangement thwarted her ability to effectively cross-examine the witness, and (3) the record contains insufficient proof of necessity to justify Kasel's sequestration. Our review of this constitutional claim is de novo. *State v. Gregg*, 464 N.W.2d 431, 432 (Iowa 1990).

Although each of Kasel's contentions has merit, the first is dispositive of her appeal. Our decision rests on a 1989 amendment to Iowa Code section 910A.14(1). *See* 1989 Iowa Acts ch. 230, § 23. Until amended, the statute authorized the court to protect child witnesses as follows:

> The court may require a party be confined to an adjacent room or behind a screen or mirror that permits the party to see and hear the child during the child's testimony, but does not allow the child to see or hear the party. However, if a party is so confined, the court shall take measures to insure that the party and counsel can confer during the testimony and shall inform the child that the party can see and hear the child during testimony.

Iowa Code § 910A.14(1) (1989); *see also State v. Hoversten*, 437 N.W.2d 240, 241

(Iowa 1989) (use of one-way mirror authorized by Iowa Code section 910A.14(1) (1987) when case-specific finding of necessity made); *In Interest of J.D.S.*, 436 N.W.2d 342, 347 (Iowa 1989) (same).

Following our decision in *State v. Coy*, 397 N.W.2d 730, 735 (Iowa 1986), and the United States Supreme Court's reversal of that decision in *Coy v. Iowa*, 487 U.S. 1012, 1021–22, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857, 867 (1988), the legislature amended section 910A.14(1) by deleting the provision quoted above. The statute now reads:

> A court may, upon its own motion or upon motion of any party, order that the testimony of a child, as defined in section 702.5, be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom to be viewed by the court. Only the judge, parties, counsel, persons necessary to operate the equipment, and any person whose presence, in the opinion of the court, would contribute to the welfare and well-being of the child may be present in the room with the child during the child's testimony.

Iowa Code § 910A.14(1) (1991). This is the statute that was in force at the time of the protective order in issue.

The parties argue whether the United States Supreme Court's subsequent opinion in *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), authorizes the procedure utilized here. We are convinced that it does not.

*Craig* concerned the application of a Maryland statute substantially similar to our former section 910A.14(1). Against the defendant's challenge that the procedure violated her sixth amendment confrontation rights, the Supreme Court held that such a right may be outweighed by a demonstrated need to protect the physical and psychological well-being of minor victims of abuse. *Craig*, 497 U.S. at ——, 110 S.Ct. at 3168–69, 111 L.Ed.2d at 684–85. Thus where the State has authorized procedures to advance this public policy—and case-specific findings of necessity are made—a defendant's right of face-to-face confronta-

tion may be limited. *Id.* at ——, 110 S.Ct. at 3169–70, 111 L.Ed.2d at 685–86.

■ The problem with applying *Craig* to the present case is that our statute no longer expresses the public policy upon which *Craig* is anchored. Iowa Code section 910A.14(1) still permits the court to protect child witnesses by shielding them from the trauma of testifying before a courtroom of strangers. But it has removed from the statute the court's authority to sequester the accused from the accuser.

The State concedes the import of this statutory revision. Yet it urges us to uphold the protective order on the basis of the court's "inherent power to regulate its courtroom." We are reluctant, however, to unleash that power when, as here, fundamental constitutional protections are at stake.

A similar argument was advanced by the State in *State v. Iowa District Court*, 464 N.W.2d 244, 247 (Iowa 1990). There the district court had employed the sequestration procedures of former section 910A.14(1) in a case involving handicapped minors whose ages put them beyond the statutory definition of children. Rejecting the State's argument that the children's mental deficiency effectively brought them under the statute's umbrella, we held we were bound by the legislature's policy as expressed by the words and definitions it chose. *Id.* at 247. A broader construction would have effectively substituted our standard for that established by the legislature. *Id.*

The same principle applies here. The legislature has specifically deleted the statutory authorization for the protective order issued by the court. Thus we are left without the legislative underpinnings to justify denial of defendant's sixth amendment rights as "necessary to further an important public policy." *Craig*, 497 U.S. at ——, 110 S.Ct. at 3166–67, 111 L.Ed.2d at 682. A defendant's right to confront accusatory witnesses may be denied only upon such a basis. *Id.*, 497 U.S. at ——, 110 S.Ct. at 3166, 111 L.Ed.2d at 682. Therefore, we must reverse the judgment

of the district court and remand this case for a new trial in accordance with this opinion.

REVERSED AND REMANDED.