**STATE of Iowa, Appellee,**

v.

**Jack Spencer EVANS, Appellant.**

**No. 91–288.**

Supreme Court of Iowa.

Feb. 17, 1993.

Rehearing Denied March 26, 1993.

Bonnie J. Campbell, Atty. Gen., Bruce Kempkes, Asst. Atty. Gen., Richard Lytle, County Atty., and Robert Glaser, Asst. Atty. Gen., for appellee.

Amanda Potterfield of Johnston, Larson, Potterfield, Zimmermann & Nathanson, P.C., Iowa City, for appellant.

LARSON, Justice.

Jack Spencer Evans was convicted of first-degree murder, Iowa Code §§ 701.1, .2 (1989), and he appealed. He urged constitutional arguments, based on the Fifth and Sixth Amendments and ineffective assistance of counsel. The court of appeals reversed on Evans' Fifth and Sixth Amendment grounds, and we granted further review. We vacate the court of appeals decision and affirm the district court.

On September 11, 1990, the body of eighty-one-year-old Della Forbes was found in her rural home near Keosauqua, Iowa. She had been killed several days before, shot five times with .38 Special bullets. Law enforcement officials learned that Evans had recently purchased a .357 magnum, which was capable of firing .38 Specials. Evans lived about a mile from the victim's home. On September 18, officers went to the Evans residence to inquire about Evans' gun and obtained possession of it. Ballistics tests showed that this was the murder weapon.

On September 19, Department of Criminal Investigation Agents Mower and Hedlund went to the Evans residence to interrogate Evans. They had a search warrant, but they did not have an arrest warrant at that time. Immediately when the officers arrived, they read Evans his *Miranda* rights, and he signed a waiver form. The officers began their questioning but did not execute the search warrant for some time.

About a half-hour into the interview, Evans was informed that his gun had been identified as the murder weapon and that he was a suspect. He immediately stopped the interview. The agents then told Evans they had a search warrant.

Prior to executing the search warrant, the agents called the sheriff's office and learned that there was a mistake in the legal description on the warrant. Agent Mower left to get a corrected warrant. Hedlund stayed with Evans to make sure that no evidence was destroyed.

After Mower left, Hedlund and Evans remained silent for about a half-hour. Evans then asked Hedlund if he could ask him additional questions. Hedlund reminded Evans that Evans had requested that the interview cease, and that he could talk to Evans only if Evans waived his *Miranda* rights. Evans began to talk again, although he averted any conversation about the murder until Hedlund redirected the conversation to that subject. During this second half of the interview, Evans made several incriminating statements. Evans moved to suppress these statements on Fifth and Sixth Amendment grounds.

The district court denied Evans' motion to suppress. As to the Fifth Amendment, the court ruled that Evans was not "in custody" and further that he had freely and voluntarily waived his *Miranda* rights. As to the Sixth Amendment argument, the court found that Evans made the incriminating statements before his right to counsel attached.

■ Our review is de novo. Nevertheless, the district court's findings on credibility of the witnesses are entitled to considerable deference by this court. *State v. Farris*, 359 N.W.2d 190, 192 (Iowa 1984);

*State v. Hatter*, 342 N.W.2d 851, 854 (Iowa 1983).

## I. *The Fifth Amendment Argument.*

■ The protections of *Miranda* are afforded only in those interrogations that are custodial in nature because of their inherently coercive effect. *See Edwards v. Arizona*, 451 U.S. 477, 486, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387 (1981) ("Absent such [custodial] interrogation, there would have been no infringement of the right that [the suspect] invoked...."); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S.Ct. 1602, 1621, 16 L.Ed.2d 694, 716 (1966) (rule to apply to "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subject to the techniques of persuasion described above...."); *State v. Kasel*, 488 N.W.2d 706, 708 (Iowa 1992) (need to give *Miranda* warnings arises only on proof of both custody and interrogation). As the Court in *Beckwith* noted:

> The narrow issue before the court in Miranda was presented very precisely in the opening paragraph of that opinion- "the admissibility of statements obtained from an individual who was subjected to *custodial* police interrogation."

*Beckwith*, 425 U.S. at 345, 96 S.Ct. at 1616, 48 L.Ed.2d at 7. Because custodial interrogation lies at the heart of *Miranda*, we must first determine whether Evans was "in custody."

■ The interrogation by the officers was held in Evans' own home, and the general rule is that in-home interrogations are not custodial for purposes of *Miranda*. In fact, the Supreme Court in *Miranda* itself made it clear that this is so because the "compelling atmosphere" giving rise to the rule is not present:

> The distinction [between such informal interviews and custodial interviews] and its significance has been aptly described in the opinion of a Scottish court:
>
> > In former times such questioning, if undertaken, would be conducted by a

police officer visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice may be, it must normally create a situation very unfavourable to the suspect. *Miranda*, 384 U.S. at 478 n. 46, 86 S.Ct. at 1630 n. 46, 16 L.Ed.2d at 726 n. 46 (quoting *Chalmers v. H.M. Advocate*, [1954] Sess. Cas. 66, 78 (J.C.)).

In *Beckwith*, the defendant was interviewed in his home, and the Supreme Court rejected his claim that the interview was custodial for *Miranda* purposes, 425 U.S. at 347, 96 S.Ct. at 1616–17, 48 L.Ed.2d at 8; and in *State v. Davis*, 446 N.W.2d 785 (Iowa 1989), we held that the in-home interrogation was not custodial:

> The atmosphere during the defendant's interview was not coercive or threatening nor was his freedom restrained. In fact, the trial court found that the atmosphere was "most pleasant." He was not deprived of his freedom in any way. He was not placed under arrest and was interviewed in his home. While he was a suspect, this status does not trigger the requirement of *Miranda* warnings. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977). The harm that *Miranda* was to eradicate was the *"incommunicado interrogation ... in a police dominated atmosphere."*

*Id.* at 788 (emphasis added) (quoting *State v. McDonald*, 190 N.W.2d 402, 404 (Iowa 1971) (in-home interrogation not custodial under *Miranda* )).

In *Beckwith*, the Supreme Court stated that applying *Miranda* to an interview in the suspect's own home, under normal circumstances, "would cut this Court's holding in *Miranda* completely loose from its own explicitly stated rationale." *Beckwith*, 425 U.S. at 345, 96 S.Ct. at 1615, 48 L.Ed.2d at 7.

In the present case, there is no claim of coercion, and none appears in the record. Evans was advised at the outset of the interview that he was not under arrest. Throughout the interview, Evans continued his domestic activities, including watching television and preparing a meal. He even offered to fix lunch and iced tea for the officers. It could be said, in fact, that the interview was under circumstances *too* relaxing and informal to be effective; at one point, the officers could not divert Evans' attention from television long enough to talk to him until one of them moved his chair to block the television.

■ The fact that police officers were involved in the questioning does not make it a custodial interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

*Id.* at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719. Similarly, the Court stated in *Beckwith*:

> Petitioner's argument that he was placed in the functional, and, therefore, legal, equivalent of the Miranda situation asks us now to ignore completely that Miranda was grounded squarely in the Court's explicit and detailed assessment of the peculiar "nature and setting of ... in-custody interrogation...."

425 U.S. at 346, 96 S.Ct. at 1616, 48 L.Ed.2d at 7 (citation omitted).

*Miranda* clearly does not apply because this was not a custodial interrogation. *See generally* Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona,* 31 A.L.R.3d 565 (1970). Even if *Miranda* did apply, our de novo review causes us to conclude, as did the district court, that Evans freely and voluntarily waived those rights.[1] Because we conclude the interrogation was not custodial, we need not discuss that evidence in detail.

## II. *The Sixth Amendment Issue.*

■ The incriminating statements made by Evans while Agent Hedlund was alone with him at the Evans home were inadmissible under the Sixth Amendment, according to Evans. He claims this was a "critical" stage of the prosecution at which he was entitled to counsel. *See United States v. Wade,* 388 U.S. 218, 226–27, 87 S.Ct. 1926, 1931–32, 18 L.Ed.2d 1149, 1157 (1967). He contends this was a critical stage because a prosecuting attorney was involved in the decision to obtain an arrest warrant, thus establishing a state commitment to prosecute. *See State v. Jackson,* 380 N.W.2d 420, 423 (Iowa 1986).

According to this argument, the right to counsel attached on the issuance of the arrest warrant, and any interrogation of Evans after that time was inadmissible. He contends this is so, even though the warrant had not been served and even though the interviewing officer did not know that there had been an application for the warrant or that the warrant had been issued.

The Supreme Court has held that the constitutional right to counsel "attaches only at or after the initiation of adversary proceedings against the defendant." *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146, 153

(1984); *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). In *Kirby,* the question was whether the right to counsel had attached after arrest, but prior to indictment. The Supreme Court held that it had not because "adversary judicial proceedings" had not yet been instituted. *Id.* at 690, 92 S.Ct. at 1882, 32 L.Ed.2d at 418. The plurality opinion in *Kirby* notes that the right to counsel attaches

> after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

*Id.* at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417.

The Supreme Court has expressly rejected the argument that an arrest alone is sufficient to invoke the Sixth Amendment right to counsel, whose "core purpose" is to aid the defendant at trial. *Gouveia,* 467 U.S. at 188, 104 S.Ct. at 2297, 81 L.Ed.2d at 154. In so holding, the Court noted the distinction between the Sixth Amendment right to counsel and the Sixth Amendment right to speedy trial:

> Our speedy trial cases hold that *that* Sixth Amendment right may attach before an indictment and as early as the time of "arrest and holding to answer a criminal charge," but we have never held that the right to counsel attaches at the time of arrest. This difference is readily explainable, given the fact that the speedy trial right and the right to counsel *protect different interests.* While the right to counsel exists to protect the accused during trial-type confrontations with the prosecutor, the speedy trial right exists primarily to protect an individual's liberty interest....

*Id.* at 190, 104 S.Ct. at 2298, 81 L.Ed.2d at 155 (emphasis added) (citations omitted).

State law prescribes the manner in which criminal cases are commenced, *Jackson,* 380 N.W.2d at 423, and we have held that the right to counsel may attach prior to the filing of a trial information or indictment,

---

1. While Evans alludes to his condition of Polycythemia Vera, we note that this is a red blood cell disease, not a mental defect. In fact, the district court noted that "[t]here is nothing in the record, nor in the court's observation of the

defendant and its listening to his testimony, to suggest that the defendant is anything other than mentally fit and fully capable of understanding these as well as all other proceedings."

depending, in part, on the level of prosecutorial involvement. *See, e.g., Jackson,* 380 N.W.2d at 423–24 (defendant had been arrested and confined; initial appearance held and bail set; held right to counsel had attached); *State v. Johnson,* 318 N.W.2d 417, 432, 435 (Iowa), *cert. denied,* 459 U.S. 848, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982) (defendant arrested but trial information not filed; held Sixth Amendment right to counsel had attached "[g]iven the significant level of prosecutorial involvement....").

We made it clear in *Johnson,* 318 N.W.2d at 435, that we did not "intimate whether the same result would follow in the absence of the prosecutorial involvement we have here." In *Jackson* and *Johnson,* there was more than the issuance of an arrest warrant; in both cases, the defendant had actually been arrested. In the present case, the arrest warrant had not been served at the time of the incriminating statements, and the only involvement of the prosecutor at that point was to participate in the decision to seek the arrest warrant. This is insufficient to invoke the Sixth Amendment right to counsel, even under the more expansive "level of prosecutorial involvement" test of *Johnson,* 318 N.W.2d at 432. It is clearly insufficient under the preferable bright-line rule of the Supreme Court, which requires institution of formal proceedings. *See, e.g., Gouveia,* 467 U.S. at 190, 104 S.Ct. at 2298, 81 L.Ed.2d at 155; *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417 (Sixth Amendment right attaches on "formal charge, preliminary hearing, indictment, information, or arraignment").

### III. *Ineffective Assistance Issues.*

■ Evans claims that his trial counsel was ineffective in several respects: failing to object to autopsy pictures, failing to object to evidence regarding his exercise of his right to remain silent, failing to object to hearsay evidence, and failing to object to the refusal of the trial court to give an alibi instruction.

The record on this appeal is insufficient to resolve these issues, and we therefore reserve them for postconviction proceedings under Iowa Code chapter 663A. *See State v. Wade,* 467 N.W.2d 283, 286 (Iowa 1991). In all other respects, the judgment of the district court is affirmed.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.

All Justices concur except SNELL, J., who dissents.

SNELL, Justice (dissenting).

I respectfully dissent. The facts show a violation of defendant's constitutional right to not be a witness against himself established by the Fifth Amendment to the United States Constitution.

The critical issue in this case centers around the events following Evans' stopping the interview conducted by Agent Hedlund at 12:22 p.m. There is no question that *Miranda* warnings had been given when the agents arrived and that Evans had signed a written waiver. But the incriminating statements were made by Evans after 12:22 p.m. when Agent Hedlund testified Evans asked that the questioning stop. Hedlund testified that Evans said he was scared before the interview stopped; he was also alone with Hedlund in the house.

For the next half hour Hedlund and Evans sat silently. The two watched television and Evans offered to fix lunch for Hedlund. Evans asked if he could use the phone. Hedlund said yes, but Evans did not make a call. Evans used the bathroom; Hedlund asked him to keep the door open. When Evans left the residence to go out to check his mailbox, Hedlund accompanied him. Then, around 1:33 p.m., Evans asked Hedlund if he could ask some questions. Hedlund reminded Evans that he had been advised of his rights and that he had said he did not want to answer any more questions. Hedlund testified that he said he could not renew a conversation with Evans but would be willing to talk and answer questions if Evans wanted to talk. Evans began to make small talk with Hedlund about Hedlund's life as a DCI agent. Dur-

ing this conversation the small talk was turned to a discussion of the Forbes murder. Evans alleges that Hedlund reinitiated the interrogation about the death of Forbes. Hedlund testified that the discussion merely progressed back to the investigation.

Agent Mower returned to the Evans home and served the search warrant on Evans at 2:35 p.m. Mower and other officers began searching the residence while Hedlund continued talking to Evans. The search sought clothing, blood stains and casings. Nothing retrieved from the search was offered into evidence.

Hedlund continued to question Evans. During this portion of the second conversation, Hedlund told Evans, "It is time to be a man and take responsibility for what you did." Hedlund asked Evans if he was sorry for what he had done to Forbes. Evans responded "yes." Hedlund said Evans became visibly upset and said he wanted to go outside. Hedlund followed him; Evans then told him he was frightened about going to jail and about going to prison. He indicated his fear was related to his physical safety in prison. Evans was asked by Hedlund if he was drunk or sober when he did this to Della Forbes. Evans hesitated a few seconds and then indicated that he was "sort of both." Evans then stated that he wanted to talk to his attorney; Hedlund got up and walked into the house. Sheriff Hardin arrived at the Evans residence and arrested Evans for the Forbes murder sometime between 3:00 and 3:15 p.m.

The majority finds that Evans was never in custody during this entire interrogation so Evans' Fifth Amendment rights could not be violated. Or if he was, the majority concludes, he voluntarily waived them. Ignored is the fact that Evans asked that the questioning be stopped at 12:22 p.m. When it continued, the legal consequences changed.

The majority's view that the interrogation was just a relaxing home visit by the DCI agent allows the concept of "home" to sweep away all custodial factors surrounding the agent's presence. Hedlund was in the home from 11:30 a.m. until 3:30 p.m. and would not let Evans out of his sight. He watched him in the bathroom, accompanied him to the mailbox, followed him outside to ask more incriminating questions, and told him his house was going to be searched. At no time was Evans accompanied by a family member or friend. The picture as a whole shows a custodial situation and an invoking by Evans of his constitutional rights under the Fifth Amendment.

If Evans was not legally in custody, what was he legally free to do? He could not go anyplace without Agent Hedlund dogging his heels. Hedlund said he was there to make sure no evidence was destroyed. But no search warrant had been served giving Agent Hedlund authority to seize evidence. From whence comes his authority to watch and preserve, short of search and seize, while denying that a suspect is in custody? This holding pattern condition precedent to a search or seizure or arrest was in reality a custodial status during which constitutional protections are not shelved as premature.

The protections afforded by *Miranda* are not limited to custodial situations alone but also apply when the defendant is "otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). This corollary doctrine also describes Evans' status during the interrogation.

Reliance by the majority on *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), to show that Evans was not in custody is appropriate to show that both cases involved home interviews but little else matches. The question in *Beckwith* was whether a proper *Miranda* warning had been given; Beckwith never asserted his Fifth Amendment rights during the interview. Beckwith was not restrained in any way, made no incriminating statements, but did turn over records that were used to convict him of tax fraud. All of these custodial markers are different from the case at bar.

The Fifth Amendment privilege against self-incrimination requires police to notify

the accused of his right to silence and to cut off interrogation when the accused invokes that right. *Miranda,* 384 U.S. at 468–74, 86 S.Ct. at 1624–27, 16 L.Ed.2d at 720–23. Once the right is invoked, all questioning must cease, and the accused's invocation must be "scrupulously honored" by the interrogating officers. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981); *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975).

Once the right to silence has been invoked, a valid waiver of that right cannot be established by showing only that the accused has responded to further police-initiated interrogation, even if the accused has been advised of his rights. *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386; *State v. Newsom,* 414 N.W.2d 354, 357 (Iowa 1987). However, if the accused himself reinitiates conversation by showing "a willingness and a desire for a generalized discussion about the investigation," the reinitiation is a valid waiver of the previously invoked right. *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405, 412 (1983); *Newsom,* 414 N.W.2d at 357. The State has a heavy burden of proving Evans initiated further conversations and therefore knowingly and voluntarily waived his Fifth Amendment rights. *See id.,* 414 N.W.2d at 358.

The State is unable to point to any specific statement Evans made that showed a willingness to enter a discussion about the Forbes murder. Evans testified that he wanted just a regular conversation about Hedlund's life and career in the DCI. Hedlund himself testified that Evans' questions regarded his family and his profession. The State failed to demonstrate that Evans' conversation about Hedlund's life indicated a "willingness and desire for a generalized discussion about the investigation" required to prove a waiver of the asserted right of silence.

Interrogation is not limited to asking questions; it includes "police conduct which is calculated to, expected to, or likely to evoke admissions." *See State v. Snethen,* 245 N.W.2d 308, 313 (Iowa 1976); *In re A.T.S.,* 451 N.W.2d 37, 40 (Iowa App.1989). Hedlund made statements to Evans such as "it is quite ironic that you would ask [if I'd ever been shot at]," "it is time to be a man and take responsibility for what you did," and was Evans "sorry or remorseful about what you did to Della Forbes." Each statement was calculated to evoke an admission from Evans. Hedlund turned the discussion to the Forbes murder and interrogated Evans during the course of the conversation.

This case is similar to *Newsom,* in which we found that incriminating statements were taken in violation of the defendant's Sixth Amendment right to counsel. *Newsom,* 414 N.W.2d at 358. The investigating officer told the defendant that "the ultimate decision to talk is up to you" after the defendant's counsel advised him to remain silent and counsel had left. The defendant then stated he wanted to talk about "some things." The following discussion led to inculpatory statements. Applying a Fifth Amendment analysis, the State failed to meet its burden of proving that the defendant initiated further interrogation after he had asserted his right to silence and assistance of counsel. *Id.*

In the present case, after invoking his right to silence, Evans expressed an interest in a general discussion about Hedlund's life as a DCI agent. As in *Newsom,* the State's burden of proving that the defendant initiated an interrogation about the crime simply is not met.

I believe the State fails to carry its heavy burden of proving that Evans initiated the second conversation about the murder and waived his right to silence. Statements made during this interrogation should have been suppressed. When they were admitted into evidence, Evans' constitutional right protected by the Fifth Amendment to not be a witness against himself was violated. I would reverse on this issue and order a new trial.

I dissent also from the majority's Sixth Amendment analysis that overrules, sub

silentio, our case of *State v. Johnson,* 318 N.W.2d 417 (Iowa 1982).