Cite as 2024 Ark. App. 9

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-22-701

|  |  |  |
|---|---|---|
| JASON BAXTER | | Opinion Delivered January 10, 2024 |
| | APPELLANT | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73CR-20-357] |
| V. | | |
| | | HONORABLE MARK PATE, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

**WENDY SCHOLTENS WOOD, Judge**

Jason Baxter entered a conditional plea of guilty to first-degree murder in the White County Circuit Court and was sentenced to forty years' imprisonment. On appeal, he argues that the circuit court erred in denying his five motions to suppress his interrogation. We affirm.

On May 14, 2020, while conducting a welfare check on the seventy-seven-year-old victim, Julius Williams, Officer Dillon Chandler of the Kensett Police Department discovered Williams's front door cracked open and Williams lying dead on the floor just inside the door with a gunshot wound to his face. Williams's next-door neighbor, Brandon Swain, told police that he heard a gunshot around 1:00 p.m. the day before police discovered Williams's body and that he saw a heavy-set white male with dark hair running through Williams's yard immediately after the gunshot in the direction of the neighboring trailer

park. Swain said that the man returned later with his shirt off and that he had a large scar on his back.

During the investigation, Officer Robert Parsons, chief of police of the Judsonia Police Department, went to the trailer park and took pictures of four white males who matched Swain's description: Baxter; Baxter's father, who was also at Baxter's trailer when Officer Parsons arrived; and two other individuals. While taking these photos, Officer Parsons told Baxter that they were investigating "a shooting" at Williams's home and asked if he knew anything about it. Baxter denied knowing Williams or knowing anything about a shooting. He also said he did not have a gun but admitted that he heard three shots "the other day" while he was in his home and mentioned that "if there's a murder . . . you need to know something about it." When Officer Parsons returned to Swain's home with the four photos he had taken, Swain identified Baxter as the man he saw running through Williams's yard. Officer Parsons then returned to Baxter's trailer, told him the neighbor had identified him, and said that the police wanted to speak to him if he was willing to go to the Kensett Police Department. Baxter agreed, and his father drove him to the police station.

When Baxter arrived, Officer Chandler read to him an Arkansas Rule of Criminal Procedure 2.3 rights form, which Baxter signed, acknowledging that the police asked him there to furnish information or cooperate in an investigation but that he was not legally obligated to do either. Officer Chandler also read to him a *Miranda* statement-of-rights form, which Baxter executed, waiving his *Miranda* rights. Both Officers Chandler and Parsons, who questioned Baxter at the police department, testified that Baxter did not appear intoxicated

or impaired. They recorded the entire interview on a video that was played for the circuit court at the suppression hearing.

Officer Chandler initiated the questioning by asking if Baxter knew why he was there, to which Baxter replied, "I heard three shots, looked outside. Wouldn't know what to do if I was around a murder. Freaked the hell out." When asked what Baxter knew about Williams, Baxter said that he "caught him outside the other day" at Williams's house and spoke to him about mowing his yard. Baxter said that they had not discussed a price and that he had never mowed Williams's yard. He also said that he had walked past Williams's house on the day of the murder on his way to get a soda, then claimed he said he had simply been "on a jog" that day. When Officer Parsons asked Baxter if he could explain "why people [had] seen you run from this guy's house after hearing a gunshot," Baxter replied, "I was on a jog, and I cut through[.]"

Officer Parsons eventually told Baxter that someone had shot and killed Williams, and Baxter replied, "For real?" and "I heard shots." Officer Parsons informed Baxter that a neighbor had seen him running through Williams's yard after hearing a gunshot, to which Baxter responded, "I wasn't there." When Parsons asked Baxter whether it was self-defense, Baxter continued to deny having anything to do with the shooting. He explained that he had simply been running through Williams's yard because he was on a jog and "cut through" Williams's yard. He had his shirt off because he "was sweaty," but when the officers asked to see his scar, he refused to show them. He said, "You hear a shot, you're going to run." Baxter

denied actually witnessing the shooting, however, explaining that "[h]earing shots and seeing them is total[ly] different."

When Officer Parsons began asking Baxter if he was trying to protect anyone—explaining to Baxter that he wanted Baxter to "give" him something so he could "help" him—and asking Baxter the difference if a crime is committed in self-defense, Baxter replied, "Texas." Officer Parsons said he needed to know if it was self-defense because if it was not, he would have to arrest the offender and "work it like a capital murder case." Baxter said he hoped Officer Parsons "find[s] them."

Officer Parsons and Baxter then began discussing Baxter's conversation with Williams about mowing his yard. Baxter said Williams wanted him to mow it and that they had agreed he would mow it "[w]hen it's dried out." He then revised his account and said he had not actually been to Williams's home to discuss the job but had spoken to him on the phone. When pressed again, Baxter said he had not actually called Williams, and he refused to consent to a search of his cell phone. When Officer Chandler asked Baxter why he had lied about calling Williams, Baxter said, "I've got so much anxiety from being questioned."

Chad Everetts, Baxter's probation officer, arrived during the interview and stood in the open doorway while Baxter was being questioned. Officers Parsons and Chandler left the room midway through the interview, and the following colloquy occurred between Baxter and Everetts:

BAXTER:    Shut the door.

EVERETTS:    Do what?

BAXTER:         Close the door.

EVERETTS:      No. We're running this. You sit there and shut up and don't move.

BAXTER:         Be nice if I could leave.

EVERETTS:      I'm sure it would be, buddy, but you're not. I told you to sit there and be quiet.

(*Detective Chandler returned to the interview room.*)

CHANDLER:      Right now is the best time to talk to us, man, 'cause later on down the road, it's not going to be good talk. Everything's been good right now.

BAXTER:         I've said what I had to say. Answered what you've asked.

CHANDLER:      But you also lied to us.

BAXTER:         I've got so much anxiety.

CHANDLER:      Why?

BAXTER:         Anxiety, flipping out, being questioned.

CHANDLER:      If you didn't do anything, you shouldn't have anything to flip out about.

BAXTER:         I've never been questioned like this before.

CHANDLER:      I understand that.

BAXTER:         Silence kills me.

CHANDLER:      Well, what do you want to talk about?

BAXTER:         Say what I got to say and get out of here.

The questioning continued, and Baxter admitted that he had knocked on Williams's door and then shot Williams in the face when he answered the door. He said he had thrown the

gun in some foliage behind his (Baxter's) house, which he later showed to the police, who recovered the gun.

In an information filed on June 18, 2020, Baxter was charged with one count of capital murder. On March 16, 2021, Baxter filed five separate motions to suppress the interrogation due to (1) violation of Arkansas Rule of Criminal Procedure Rule 2.3; (2) violation of the Fourth Amendment; (3) violation of the Fifth Amendment; (4) violation of the Arkansas Rules of Criminal Procedure when police prevented Baxter from leaving the interrogation; and (5) the State's failure to obtain a voluntary, knowing, and intelligent waiver of his *Miranda* rights.

On August 20, 2021, the circuit court held a hearing on Baxter's suppression motions. In addition to the testimony of Officers Chandler and Parsons about their investigation and recorded interview of Baxter, Baxter's father also testified. He said that he drove Baxter to the police station and remained in the room with him during the interview. He said that Baxter was acting peculiarly and not answering in complete sentences. He also testified that the police officers requested that he ask Baxter to tell the truth and give Baxter a hug, which he did. He said Baxter became very emotional and started crying.

Everetts testified that one of the conditions of Baxter's probation was that he not use or possess alcohol or illegal drugs. He testified that he was at the police station for Baxter's interview because the police had called Everetts to "maybe do a home visit" on Baxter and asked Everetts to come to the Kensett police station. After he arrived, he was told that there had been a homicide Baxter was "possibly involved in." Everetts said he could tell something

6

was wrong when he saw Baxter because he was acting much differently than he had in Everetts's previous interactions with him. He said in his earlier meetings with Baxter, he had been "cool and collected." Everetts said Baxter did not appear intoxicated but rather "in shock" or "kind of weirded out with this situation."

Baxter presented the testimony of psychologist Dr. Benjamin Silber, a certified forensic examiner. In addition to reviewing police records and the video of the interrogation, Dr. Silber evaluated Baxter on March 23, 2021, nine months after his arrest. During Dr. Silber's examination, Baxter told Dr. Silber that he had been hearing voices in his head for years telling him that he was gay. Dr. Silber testified that it was clear to him Baxter was hearing these voices during his interrogation with the police and that he was responding to the voices throughout the interrogation, including his responses of "[s]tay straight," "[i]t's three years," "not married," and "stuck," none of which were appropriate responses to the officer's questions. He opined that Baxter's delusions impacted his decision-making during the interrogation and that Baxter was "derailed" and "distracted" by the voices. He testified that the hallucinations "raise concerns for whether he is truly knowing and intelligent in what he is doing." Dr. Silber said Baxter explained that he intended to "plead the Fifth" when he responded "Texas" to Officer Parson's question about self-defense. Baxter told Dr. Silber that Texas was the state you can "plead the Fifth in." Dr. Silber said this concerned him because it suggested Baxter probably did not "knowingly and intelligently recognize he had these rights in the first place to waive them in a knowing and intelligent manner." Dr. Silber opined that Baxter suffered from a "settled insanity," which he said is a substance-

abuse psychotic disorder due to his lengthy history of methamphetamine use. He testified that the symptoms, hallucinations, and delusions increase significantly during times of stress.

Dr. Silber noted that, during the interrogation, Baxter often sat still and closed his eyes. Baxter explained to Dr. Silber that the voices told him they could "teleport him to another location," which he hoped would happen if he closed his eyes. Finally, Baxter told Dr. Silber that the voices informed him that if he told the officers he did it, they would let him go. He said he believed them and thought "everything would be okay" if he said he shot Williams. Dr. Silber opined that Baxter's responses were directly related to the hallucinations rather than to a rational understanding of the consequences of waiving his rights.

On December 3, 2021, the circuit court issued an oral ruling denying Baxter's motions to suppress, specifically rejecting Dr. Silber's opinion, and orally pronouncing that the "best evidence in the case . . . is the video itself." The court credited the officers' testimony that they did not believe Baxter was intoxicated, stated that it had reviewed the video more than twice and did not see that Baxter was intoxicated or that alcohol had any influence in the interview process, and specifically found that Baxter was not intoxicated during the interrogation. The court recognized that Baxter exhibited "some strange behavior" but noted that Dr. Silber never said Baxter suffered a mental breakdown during the interrogation. The court reasoned that Baxter was a twenty-four-year-old high-school graduate with no evidence to indicate that he had a low IQ and thus was old enough to understand the circumstances; agreed to go to the police station and rode there in his father's car; and was "properly" read *Miranda* warnings and the Rule 2.3 rights form, both of which he initialed and signed. The

8

court found that the entire interview did not last more than two hours; that the officers did not brandish their weapons or hover over Baxter during the interrogation; and that Baxter's father was present, able to hear what was happening, and participated. Regarding Baxter's statement to Everetts that it would be "nice if I could go home," the circuit court found Baxter never asked for an attorney and never "specifically asked for the interview to cease." The court entered a written order on March 30, 2022, denying Baxter's motions to suppress, and on April 12, Baxter entered a conditional guilty plea reserving his right to appeal the suppression issues.

When reviewing the denial of a motion to suppress evidence, the appellate courts conduct a de novo review based on the totality of the circumstances, reviewing findings of fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause. *Baird v. State*, 357 Ark. 508, 513, 182 S.W.3d 136, 139 (2004). We will not reverse the circuit court's decision unless it is clearly against the preponderance of the evidence. *Fricks v. State*, 2016 Ark. App. 415, at 4, 501 S.W.3d 853, 856. We give due weight to inferences drawn by the circuit court, recognizing that it has a superior opportunity to determine the credibility of witnesses and weight to be given to their testimony. *Batchelor v. State*, 2014 Ark. App. 682, at 2, 450 S.W.3d 245, 246.

I. *Violation of Arkansas Rules of Criminal Procedure 2.2 and 2.3*

Baxter contends that law-enforcement officers violated his rights under Arkansas Rules of Criminal Procedure 2.2. and 2.3 by implying that he was required to go to the police station and failing to inform him that he had no legal obligation to do so. The State responds

9

that the police made it clear to Baxter that his appearance was voluntary. The relevant rules provide the following:

> (a) A law enforcement officer may request any person to furnish information or otherwise cooperate in the investigation or prevention of crime. The officer may request the person to respond to questions, to appear at a police station, or to comply with any other reasonable request.
>
> (b) In making a request pursuant to this rule, no law enforcement officer shall indicate that a person is legally obligated to furnish information or to otherwise cooperate if no such legal obligation exists. Compliance with the request for information or other cooperation hereunder shall not be regarded as involuntary or coerced solely on the ground that such a request was made by a law enforcement officer.

Ark. R. Crim. P. 2.2 (2022).

> If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

Ark. R. Crim. P. 2.3 (2022). A police officer is not required to make an express statement that the person is under no legal obligation to comply; the question is whether a reasonable person would feel free not to comply. *Green v. State*, 2012 Ark. 347, at 7, 423 S.W.3d 62, 67.

Here, Officer Parsons testified that he told Baxter, "[T]he Kensett Police Department does want to speak to you . . . if you're willing to come up to the PD." He specifically said that he did not tell Baxter he had to go. Officer Parsons then told Baxter's father, "I'll let you bring him up there." Moreover, as soon as Baxter arrived at the police station, police provided him with a Rule 2.3 rights form and read his *Miranda* rights to him. Baxter executed both forms. Further, there is no evidence in the record that Baxter was threatened. We hold

that the circuit court did not clearly err in denying Baxter's motion to suppress his interrogation on this basis. *Charland v. State*, 2011 Ark. App. 4, 380 S.W.3d 465 (holding suppression not required when officers failed to expressly inform defendant that he was not legally obliged to comply with officers' request to accompany them to police station where police officers did not threaten defendant in any way when asking defendant to go to station, defendant and his wife traveled to station in their own vehicle, and defendant was advised of his *Miranda* rights before statements were made).

## II. *Violation of Arkansas Rules of Criminal Procedure 3.1 and 4.1*

Baxter argues that the officers violated the Arkansas Rules of Criminal Procedure when they prevented him from leaving the interrogation. He alleges that he was detained for two hours and that neither Rule 3.1 nor Rule 4.1 sanctions the officers' conduct. Rule 3.1 permits an officer to "detain any person who he reasonably suspects is committing, has committed, or is about to commit" a crime for a period of fifteen minutes or for a reasonable time under the circumstances. Ark. R. Crim. P. 3.1 (2022). Rule 4.1 involves the arrest of a suspect, which did not occur in this case until after Baxter was interviewed. *See* Ark. R. Crim. P. 4.1. Neither of these rules is relevant because Baxter came willingly to the police station as discussed earlier. He was not detained under Rule 3.1, nor was he arrested before he was interviewed.

## III. *Violation of the Fifth Amendment*

Baxter argues that the circuit court should have suppressed his interrogation because the police violated his right to remain silent and end the interrogation under the Fifth

11

Amendment. He points specifically to his request to his probation officer to close the door after the investigative officers left the interrogation room during the interrogation. Everetts said, "No. We're running this. You sit there and shut up and don't move." And Baxter replied, "Be nice if I could leave." Everetts responded, "I'm sure it would be, buddy, but you're not. I told you to sit there and be quiet." The officers then returned, and the questioning continued. Baxter cites *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966), in support of his argument that if an individual indicates at any time prior to or during questioning that he wishes to remain silent, the interrogation must end.

It is blackletter law that a defendant's right to remain silent must be "scrupulously honored" when it is invoked. *Fritts v. State*, 2013 Ark. 505, at 8, 431 S.W.3d 227, 231. The question in this case is whether Baxter invoked that right. An invocation of the right to remain silent must be unequivocal and unambiguous, *id.* at 10, 431 S.W.3d at 233, and answering questions following a statement that attempts to invoke the right to remain silent may waive that right by implication. *Bryant v. State*, 2010 Ark. 7, at 15, 377 S.W.3d 152, 161.

In support of his argument, Baxter cites *State v. Kasel*, 488 N.W.2d 706 (Iowa 1992), which he contends is "nearly identical" to the case at bar. Kasel was twenty-two years old, had been enrolled in special-education classes when in school, was of "limited abilities," was dependent on her parents, had been unable to maintain a job other than babysitting, and had been charged with sexually abusing a seven-year-old boy for whom she regularly babysat. *Id.* at 708. During questioning at the police station, Kasel refused to execute a waiver of her *Miranda* rights, stormed out of the interrogation, and was grabbed by her arm and returned

to the room by an officer who told her that "the rules have changed." *Id.* Crying and upset, Kasel broke down, telling police she would tell them what happened if she could go home with her mother. *Id.* at 709. The Iowa Supreme Court held that Kasel's privilege against self-incrimination was not honored because her "obvious attempt to end the interrogation and rejoin her mother was met with a firm rebuke and physical restraint." *Id.*

We hold that *Kasel* is inapposite. First, unlike Kasel, Baxter executed a waiver of his *Miranda* rights before the officers began to question him. Moreover, the circuit court specifically found no evidence that Baxter was impaired or of limited abilities. Finally, Baxter did not "storm out" of the interrogation room indicating an unequivocal and unambiguous invocation of his right to remain silent, and he was not physically restrained. Rather, after the police officers left the room midway through the interview, he told his probation officer that it would be nice if he could leave. *Kasel* is not persuasive.

In *Standridge v. State*, 329 Ark. 473, 951 S.W.2d 299 (1997), the supreme court held that a suspect's statement that "I ain't ready to talk" was not an unequivocal invocation of his right to remain silent when he continued to talk and answer questions. In addition, in *Bryant v. State*, 2010 Ark. 7, at 15, 377 S.W.3d 152, 161, the supreme court held that the following statement was not an unequivocal request to invoke the right to remain silent: "Okay, then we're through with this interview then." The court reasoned that the statement was made after the defendant had repeatedly denied committing the offense and the detective had repeatedly refused to believe the defendant. *Id.* at 15, 377 S.W.3d at 161. That is, the two had been arguing when defendant made the statement that the interview was

"through." However, after making the statement, the defendant kept talking and denying his involvement. *Id.* at 15, 377 S.W.3d at 161. The court held not only that this was not an unequivocal request but also that the defendant's willingness to continue the conversation implicitly waived any attempt to invoke that right. *Id.* at 15, 377 S.W.3d at 161.

In the case at bar, during a break in the interrogation, Baxter told Everetts—who was merely present but not a participant in the interrogation—that it would be nice if he could leave. When the officers who were questioning Baxter returned to continue the interrogation, Baxter continued to answer their questions and said he wanted to say what he had to say and then "get out." Never again did Baxter indicate that he did not want to continue the interrogation, nor did he attempt to invoke his right to remain silent. Therefore, we hold that Baxter's statement to his probation officer that it would be nice if he could leave did not constitute an unequivocal and unambiguous invocation of his right to remain silent. And, in any case, by continuing the interrogation with the officers, he waived this right.

## IV. *Violation of Fourth Amendment*

Baxter argues that the circuit court should have suppressed the interrogation because the officers violated his rights under the Fourth Amendment. He contends that when he asked to leave and Everetts told him "you're not" and to "sit there and be quiet," he had been seized for purposes of the Fourth Amendment and thus that the officers were required to have probable cause to arrest him. The State does not dispute that Baxter transitioned from a witness to a suspect at that point and had been "seized" for purposes of the Fourth

14

Amendment, but it contends that the officers then had probable cause at that point to detain him.

Probable cause is determined by applying a totality-of-the-circumstances test and exists where facts and circumstances within the collective knowledge of the officers are sufficient to permit a person of reasonable caution to believe that an offense has been committed by the person to be arrested. *Baird v. State*, 357 Ark. 508, 513, 182 S.W.3d 136, 140 (2004); *Hudson v. State*, 316 Ark. 360, 364, 872 S.W.2d 68, 70 (1997); *Harris v. State*, 2017 Ark. App. 348, at 4, 525 S.W.3d 472, 475. Probable cause does not require the degree of proof necessary to sustain a conviction, *Harris*, 2017 Ark. App. 348, at 5, 525 S.W.3d at 475, and in assessing the existence of probable cause, our review is liberal rather than strict. *Erby v. State*, 2023 Ark. App. 220, at 3–4, 663 S.W.3d 811, 814.

The record reflects that when Baxter asked to leave the interrogation, the officers had knowledge of the following facts and circumstances. Baxter was seen by a neighbor running in Williams's yard immediately after the neighbor heard the shots fired. When asked to explain why the neighbor saw him there, Baxter said, "I was on a jog, and I cut through[.]" Baxter also gave inconsistent statements about where he was when he heard the shots on the day of the murder—first at home, then walking in Williams's yard on the way to get a soda, and then on a jog. He gave conflicting statements about whether he knew Williams and when and in what manner he had spoken with him. He initially denied knowing Williams but later admitted that he and Williams had discussed his mowing Williams's yard at Williams's home "the other day." He said that he had not yet mowed the yard, and his

15

explanation on whether or when they had agreed he would do so was inconsistent. He also said that he had spoken on the phone to Williams about the yard but then denied that he had talked to him on the phone. Finally, Baxter mentioned "murder" twice—once at his trailer and once at the initiation of the interview, both times before officers had informed him that Williams had been killed—and then he feigned surprise later in the interview when he was told Williams was dead. Recognizing that probable cause does not require the degree of proof necessary to sustain a conviction and that our review in probable-cause-suppression cases is liberal rather than strict, we hold that the officers had probable cause to believe that Baxter had committed the offense of capital murder. Thus, the circuit court's decision to deny Baxter's motion to suppress on the basis of the Fourth Amendment is not clearly against the preponderance of the evidence.[1]

## V. *Waiver of Miranda Rights*

Finally, Baxter argues that the circuit court erred in not suppressing the interrogation because it was conducted without a voluntary, knowing, and intelligent waiver of his *Miranda* rights. In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and

---

[1]In deciding that probable cause existed to detain or arrest Baxter, the circuit court stated that it had reviewed "[its] notes, testimony, video, the officers were aware that there had been a report filed by the decedent regarding some criminal mischief alleging that a person who – had recently moved in the trailer park may have been the person behind – behind the criminal mischief issue." Although the State mentioned this report in a pleading and in closing argument at the suppression hearing, no such report was ever introduced into evidence, and the record does not contain the alleged report. Despite the circuit court's mistaken analysis including a report that is not in evidence, the circumstances outlined above are sufficient to establish probable cause.

intelligent, the appellate courts look to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006). To make this determination, we review the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Bryant v. State*, 2010 Ark. 7, at 11–12, 377 S.W.3d 152, 159. Although mental capacity is a factor to be considered, standing alone, it does not support suppression. *Sweet v. State*, 2011 Ark. 20, at 19, 370 S.W.3d 510, 523. Additionally, the fact that the defendant is not a stranger to the criminal-justice system is a factor to be considered in determining whether a custodial statement was voluntarily made. *Id.* at 19, 370 S.W.3d at 523. Finally, we will reverse the circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.* at 19, 370 S.W.3d at 523.

The circuit court specifically found at the hearing that Baxter's waiver of his right to counsel and his *Miranda* rights was voluntary, knowing, and intelligent and provided the following explanation: Baxter was twenty-four years old, had a high-school education, and could read and write with no evidence that his IQ was "low or improper"; the proper rights forms were provided and read to him, and he initialed them; the detention did not last more than two hours; and there was no use of physical or mental punishment during the interview. We also note that the record indicates that Baxter properly filled out the statement-of-rights

forms by providing his name, birth date, and Social Security number. Moreover, although he said some things that appeared unresponsive to the officers' questions, both officers testified that Baxter did not appear intoxicated. The circuit court specifically found that Baxter was not intoxicated and noted that he did not appear to be mentally impaired or of low IQ, rendering him unable to understand his rights. In addition, Baxter refused to consent to a search of his phone or to show the officers the scar on his back when asked, indicating he understood his right to deny the officers' requests. Finally, Baxter is not a stranger to the criminal-justice system and was on probation at the time of the offense. Our de novo review of this record does not convince us that the circuit court's finding that he understood his rights and that his waiver was voluntary, knowing, and intelligent was clearly against the preponderance of the evidence.

Affirmed.

VIRDEN and KLAPPENBACH, JJ., agree.

*Short Law Firm*, by: *Lee D. Short*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.