

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-16-208

| | |
|---|---|
| FREDERICK A. FRICKS | **Opinion Delivered:** September 21, 2016 |
| APPELLANT | APPEAL FROM THE NEVADA COUNTY CIRCUIT COURT [NO. 50CR-14-37] |
| V. | |
| STATE OF ARKANSAS | |
| APPELLEE | HONORABLE RANDY WRIGHT, JUDGE |
| | AFFIRMED |

**BART F. VIRDEN, Judge**

Appellant Frederick Fricks entered a conditional guilty plea in the Nevada County Circuit Court to offenses involving drugs and firearms. He was sentenced as a habitual offender to an aggregate term of thirty years' imprisonment. On appeal, he argues that the trial court erred in denying his motion to suppress (1) evidence found in a search of his vehicle and (2) an incriminating statement he made while in custody. We affirm.

I.        *Suppression Hearing*[1]

Trooper Aaron Easley with the Arkansas State Police was patrolling Interstate 30 in a "stealth" car on April 22, 2014, at approximately 4:22 p.m. when he observed a black truck with a license-plate tag that he testified "didn't look right." Easley explained that

---

[1] Two suppression hearings were held approximately six months apart. Easley was the only witness at the first hearing, and the trial court denied Fricks's motion to suppress. A second hearing was held after Fricks had obtained new counsel. At the second hearing, Easley, two other law-enforcement officers, Fricks, and Fricks's father testified. In addition, a dash-cam video was played. The trial court again denied the motion to suppress.

Arkansas's expiration tags are color coded and alternate every three years with yellow, blue, and red. Easley cited as an example that the tags in 2011 and 2014 were yellow. According to Easley, the "4" on the truck's yellow tag "looked a little funny." When he ran the license plate, he discovered that the tags had expired in 2011. Easley then initiated a stop of the vehicle.

Easley made contact with Fricks, the driver of the truck. Easley relayed to Fricks that someone had taken a "magic marker" and changed the second "1" in "2011" to a "4". According to Easley, Fricks did not have a driver's license and said that he had borrowed the truck from a friend. When Easley entered Fricks's name into NCIC (National Crime Information Center), he learned that Fricks had a warrant for a parole violation. Fricks informed Easley that he was on parole for a drug offense. Easley confirmed the warrant and was advised to take Fricks into custody. Before the tow truck arrived, Easley and another officer searched the truck. Under the driver's seat, Easley found a Smith and Wesson handgun and a box of ammunition. Behind the passenger's seat, he found a clear plastic bag containing what appeared to be marijuana and a set of scales.

Easley testified that he completed a form ASP168 in connection with an inventory search at the tow yard about an hour after the initial search where he had secured the contraband mentioned above. Easley stated that he had decided to impound the vehicle as soon as he learned about Fricks's warrant and reasoned that the vehicle was neither licensed nor insured. Easley said that, anytime the police remove a vehicle from the road, they conduct an inventory pursuant to police policy. The "Law Enforcement Policy Manual" on administrative inventory of vehicles provides that

[a]n Arkansas State Police officer directing that a motor vehicle be seized, towed or impounded as a consequence of an arrest or for other good cause shall conduct an administrative inventory of the motor vehicle pursuant to the following procedures: The Arkansas State Police officer should perform the inventory in the location at which the vehicle is seized, towed from or impounded unless limited by reasons of safety or practicality. If the inventory is not conducted prior to the vehicle being transported, the inventory may be conducted within a reasonable time following seizure, towing or impoundment as reasonably necessary for safekeeping of the vehicle and its contents.

Easley said that typically he has the wrecker driver sign the form, and he then gives a copy to the wrecker driver. He said that, when the owner arrives to pick up his vehicle, the wrecker driver obtains that person's signature on the copy and mails it to Troop G. Easley testified that this did not happen in the present case because he did not receive the returned copy and could not locate the original.

Special Agent Corwin Battle with the Arkansas State Police testified that he made contact with Fricks at the jail. Although Battle went over a *Miranda* rights form with Fricks, Fricks refused to sign it, and the interview ended. According to Battle, it is common for officers to seize contraband prior to towing a vehicle. He stated that Easley transferred the items seized from Fricks's truck to him, and he then accompanied Easley to the tow yard to conduct a more thorough search of Fricks's truck. Easley did not have his inventory book with him in the stealth car, so Battle gave him a brand new book that Battle did not need. Battle said that he saw Easley fill out the inventory form and give a copy of it to the wrecker driver.

Detective Todd Lauterbach with the Hope Police Department testified that he went to the Nevada County jail to speak with Fricks after learning that a stolen gun had been found in Fricks's vehicle. Lauterbach stated that Fricks told him that he had been given his

3

*Miranda* rights but had not invoked his right to counsel. When Lauterbach asked to speak with him, Fricks refused. Lauterbach then informed Fricks that the Arkansas State Police was charging him with theft by receiving and that he could be charged by the Hope Police Department as well. Lauterbach testified that Fricks then said that he did not remember where he had gotten the gun but that he thought he had bought it from someone in Hope.

Fricks agreed making the statements attributed to him by Lauterbach, but he testified that he had raised the possibility that police could have planted the gun in his truck. Also, he stated that Lauterbach had originally mentioned a burglary. Fricks and his father, the owner of the truck, testified to items of value that had been inside the truck. Fricks's father testified that a chainsaw worth $500 to $1,000 was missing.

## II.    *Standard of Review*

When we review the denial of a suppression motion, this court makes an independent examination of the evidence based on the totality of the circumstances, and we will not reverse the trial judge's decision unless it is clearly against the preponderance of the evidence. *Cooper v. State*, 2010 Ark. App. 539. We defer to the superior position of the trial court to determine the credibility of witnesses. *Bratton v. State*, 77 Ark. App. 174, 72 S.W.3d 522 (2002).

## III.    *Discussion*

### A.    Inventory Searches

All warrantless searches are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest on a valid warrant. *Bratton, supra.* An inventory search is recognized as an exception. *Id.* Pursuant to this exception, police officers may

conduct a warrantless inventory search of a vehicle that is being impounded in order to protect an owner's property while it is in the custody of the police, to ensure against claims of lost, stolen, or vandalized property, and to guard the police from danger. *Id.* An inventory search, however, may not be used as a guise for "general rummaging to discover incriminating evidence." *Id.* The police may impound a vehicle and inventory its contents only if the actions are taken in good faith and in accordance with standard police procedures or policies. *Id.*

Fricks argues that this inventory search was improper because Easley did not follow police policy in several respects. First, Fricks contends that the State failed to produce the inventory form and did not call the wrecker driver to testify in order to corroborate testimony that he had in fact received the form. The failure to introduce the form at the hearing does not mean that Easley did not follow policy. Both Easley and Battle testified that the form was completed and a copy was given to the wrecker driver. The trial court could have believed this testimony such that the wrecker driver's testimony was unnecessary.

Second, Fricks argues that Easley gave false testimony regarding where he had completed the inventory form. Easley initially said that he had completed it alongside the road, which the dash-cam video disproved, and later claimed that it had been completed at the tow yard. To the extent that Easley's testimony differed from one hearing to the next, it was for the trial court to resolve any conflicting testimony. *Bratton, supra.* The testimony indicates that Easley secured the contraband prior to towing the vehicle and completed the inventory form when he conducted a more thorough search at the tow yard. Easley's roadside search was limited by concerns about safety in that the officers were standing next

to a busy interstate, which Easley recognized as dangerous on the dash-cam video. Further, Easley said that the inventory was conducted within an hour or so after the vehicle had been towed from the scene, which the trial court could have concluded was "within a reasonable time" pursuant to police policy.

Third, Fricks argues that neither Easley nor Battle could accurately identify items of value found inside the vehicle. Both officers testified to finding several noncontraband items. Failure to recall every single item that was found in the absence of the missing inventory form does not mean that Easley disregarded police policy. Although Easley's testimony differed from the testimony of Fricks's father regarding the value he assigned to certain items, the policy manual does not say how officers are to determine value. Further, we note that Fricks's father may file a complaint with the police regarding any missing items.

Next, Fricks maintains that the search was investigatory in that Easley ended the search as soon as he found incriminating items and that the dash-cam video reveals Easley's true motive when he said, "I just want to get [Fricks] gone so I can get in the vehicle. He's been arrested for dope, dope, and dope. He's been arrested for carrying a weapon."

To suppress an inventory search, a defendant must show that the police officers were conducting the inventory search in bad faith for the sole purpose of collecting evidence. *Welch v. State*, 330 Ark. 158, 955 S.W.2d 181 (1997). The presence of an investigatory motive, even if proved, does not invalidate an otherwise lawful inventory search. *Bratton, supra*. Easley's comment does not reveal that his motive was solely investigatory or that the search was otherwise conducted in bad faith. Easley testified that he was "pretty sure" there was contraband in the vehicle given Fricks's demeanor and the fact that he was sweating

profusely. Easley further stated that Fricks was a large man and that he was afraid that the officers were "going to have a problem" with him if they discovered contraband in his presence. Just because Easley suspected that they might find incriminating items because of Fricks's mention that his parole was related to drugs does not invalidate the search. *Bratton, supra.*

Fricks also maintains that the search was not proper under Ark. R. Crim. P. 12.4 in that it was not a search incident to arrest. We need not address this argument because we hold that the evidence was seized in connection with a proper inventory search and that the trial court's denial of Fricks's motion to suppress was not clearly against the preponderance of the evidence.

### B. Custodial Statement

Fricks contends that pursuant to Ark. R. Crim. P. 4.5, no law-enforcement officer shall question an arrested person if he has indicated in any manner that he does not wish to be questioned. Fricks argues that he had made it clear to both Battle and Lauterbach that he did not want to be questioned and that "[o]nce the Appellant invoked his right to remain silent to Agent Battle he could not be questioned again by Detective Lauterbach." Fricks argues that Lauterbach failed to read him his *Miranda* rights and that he did not immediately end the conversation and instead "continued to make statements" to him.

In determining whether a defendant's custodial statement was spontaneous, we focus on whether it was made in the context of a police interrogation, meaning direct or indirect questioning put to the defendant by the police with the purpose of eliciting a statement from the defendant. *Id.* A suspect's spontaneous statement while in police custody is

admissible, and it is irrelevant whether the statement was made before or after *Miranda* warnings because a spontaneous statement is not compelled or the result of coercion under the Fifth Amendment's privilege against self-incrimination. *Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 214. Here, Fricks's statement was spontaneous and not in response to direct or indirect questioning by police. The trial court could have reasonably concluded that Lauterbach was only informing Fricks of possible charges that could be filed against him and not attempting to elicit an incriminating statement. We hold that the trial court's decision was not clearly against the preponderance of the evidence.

Fricks further argues that his statement should be suppressed because it was not recorded pursuant to Ark. R. Crim. P. 4.7. The rule does not mandate the recording of all custodial interviews—it says "whenever practical," and the lack of a recording is not considered in determining admissibility when what is involved is a spontaneous statement. Ark. R. Crim. P. 4.7(b)(2)(D). In any event, Fricks did not make this argument below and did not obtain a ruling on the issue. Therefore, it is not preserved for our review. *Calfy v. State*, 2015 Ark. App. 169; *Freeman v. State*, 2012 Ark. App. 144, 391 S.W.3d 682.

Affirmed.

ABRAMSON and GRUBER, JJ., agree.

*Bill Luppen*, for appellant.
*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.