Cite as 2025 Ark. App. 558

# ARKANSAS COURT OF APPEALS
## DIVISION III
#### No. CR-25-15

| | |
|---|---|
| NOAH THOMPSON | Opinion Delivered November 19, 2025 |
| APPELLANT | |
| | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT |
| V. | [NO. 16JCR-23-1191] |
| STATE OF ARKANSAS | |
| APPELLEE | HONORABLE RANDY PHILHOURS, JUDGE |
| | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Appellant Noah Thompson appeals his conviction—following a conditional plea of no contest—of theft by receiving a firearm and possession of a controlled substance and resulting sentence of thirty-six months' probation. Thompson argues on appeal that the circuit court erred by denying his motion to suppress physical evidence seized during law enforcement's warrantless seizure and search of his person and residence and, furthermore, that the circuit court erred by refusing to suppress his custodial statements. We affirm.

### I. *Background Facts*

On July 25, 2011, the City of Jonesboro filed a complaint for injunction and an order of abatement in a civil matter alleging that various properties in the Cedar Heights neighborhood, including the property at 1835 Cedar Heights Drive, were a public nuisance.

The circuit court entered an agreed order of abatement declaring the properties a public nuisance and "detrimental to the public morals." Furthermore, the order placed the properties in the custody of the Craighead County Circuit Court pursuant to Arkansas Code Annotated section 16-105-413 (Repl. 2016) and specifically provided that "the Defendant or any other person present at the residence shall allow the Jonesboro Police Department to search the premises to ensure that no activities in furtherance of this nuisance are occurring on the property." The order further directed the City of Jonesboro to place signs on the affected properties—including 1835 Cedar Heights Drive—specifically warning that "the property and all persons on the property are subject to search by the Jonesboro Police Department."

On October 4, 2023, Investigator Tanner Huff with Jonesboro Police Department's Street Crimes Unit was in the Cedar Heights neighborhood and saw several males congregating outside of Thompson's residence. Pursuant to the abatement order, Huff and other members of the crime unit chose to perform a search of both the individuals at the residence and the property itself. As Huff approached the property, he alleged that he could smell the distinctive odor of marijuana and that Thompson was in the process of exiting the front door of the residence. According to Huff's bodycam video, Thompson was immediately searched, and two oxycodone pills were seized. Huff also saw two promethazine cough syrup bottles with torn labels—one with a usable amount—and a rolled marijuana "blunt" near the front door of the residence. Following a brief telephone call with the Jonesboro city attorney, Huff then entered the residence, pursuant to the ostensible authority given by the abatement

2

order, and conducted a second search. The search yielded a .40-caliber Glock pistol that had been reported stolen, a scale with marijuana residue, eleven empty bottles of promethazine with the labels torn off, and a rolling tray. These items were found in and around the living room area of the residence; the firearm was found in a couch cushion in the living room.

Huff's bodycam video evidenced that the living room area was being occupied by one or more individuals. According to Thompson's mother, who rented the residence, Thompson "lived" in the living room area when he stayed there. Following the search, Huff walked outside and announced that it was his intent to arrest everyone in and around the residence on the basis of the seizure of the stolen firearm. At this point, several of the individuals began protesting their arrests. Thompson claimed ownership of the seized firearm at that time. Due to the noise of the protests, Huff stated that he did not hear Thompson's statement. The following day, during his postarrest Mirandized statement, Thompson again claimed ownership of the seized gun. Thompson was charged with one count of theft by receiving, a Class D felony, and one count of possession of a controlled substance, a Class D felony.

Thereafter, Thompson moved to suppress the seized firearm and drugs found during the searches, arguing that the warrantless search and seizure violated his Fourth Amendment rights. Additionally, Thompson maintained that his statement regarding ownership of the stolen firearm before he was Mirandized should be suppressed because it was not voluntary— but rather occurred while he was in custody. Regarding Thompson's statement of ownership

of the firearm, after he was arrested and Mirandized, he argued that it was inadmissible because it followed his unlawful arrest.

In ruling on Thompson's motion, the circuit court entered a comprehensive order detailing its conclusion of law. The court found that the warrantless searches and seizures violated Thompson's Fourth Amendment; thus, the drugs seized from Thompson and the stolen firearm seized from the residence were subject to suppression. However, the court found that suppression of the evidence seized—on this specific set of facts—was contrary to the underlying rationale for the exclusionary remedy and inappropriate. In doing so, the circuit court cited United States Supreme Court precedent explaining that the sole purpose of the exclusionary rule is deterrence; thus, when there will be no appreciable deterrent effect of law enforcement misconduct gained through exclusion, it is unwarranted. *See, e.g.*, *Arizona v. Evans*, 514 U.S. 1 (1995). Furthermore, the court applied the good-faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984). Specifically, the circuit court held:

> While there was no warrant here, the rationale of *Leon* remains applicable. In a myriad of post-*Leon* cases, the Supreme Court has made clear that law enforcement's objectively reasonable reliance on facts, laws and circumstances despite their subsequent invalidity neither implicates the exclusionary rule nor mandates exclusion of the illegally seized evidence in a criminal trial. *See, e.g.*, *Arizona v. Evans*, 514 U.S. 1 (1995) (exclusionary rule inapplicable to clerical errors); *Michigan v. DeFillippo*, 443 U.S. 31 (1979) (exclusionary rule inapplicable to statutes later declared unconstitutional); *Davis v. United States*, 564 U.S. 229 (2011) (exclusionary rule inapplicable to binding appellate precedent later declared unconstitutional).

> The facts here are important, and Huff's actions on October 4, 2023, are equally important. Both highlight the undeniable truth that exclusion of the evidence seized from [Thompson's] person and the evidence seized from [Thompson's] Property is inappropriate in this particular case because exclusion would have no deterrent effect.

4

The Abatement Order was filed in the civil division of this Court on July 25, 201l. Shortly thereafter, the City of Jonesboro posted signs throughout the Cedar Heights neighborhood warning all present in the neighborhood that their mere presence within the abatement zone might subject them to warrantless searches and warning tenants in the neighborhood that their leaseholds were also subject to warrantless searches. The Abatement Order remained unchallenged and in effect in this area until [Thompson] filed his Motion on April 11, 2024. For nearly thirteen (13) years, the Abatement Order's provisions allowing for warrantless searches has remained unchallenged.

Additionally, the circuit court found that Thompson's statements in which he took ownership of the stolen firearm were admissible. The court held that the first statement Thompson made at the scene—while in custody—was admissible as a spontaneous statement. The circuit court noted that because it had the benefit of watching and hearing the entire interaction recorded on Huff's bodycam video, "[i]t would stain credulity to even suggest that Huff's statement to the assembled masses was an unconstitutional custodial interrogation." Rather, the court held that Thompson's statement was "purely voluntary and completely gratuitous." Regarding the second statement, the circuit court highlighted that Thompson's only argument in support of its inadmissibility was premised on a finding that Thompson's first statement was involuntary. Accordingly, the court held that because the first statement was voluntary and admissible, Thompson's post-*Miranda* statement was as well.

Thompson entered a conditional plea of no contest, pursuant to Arkansas Rule of Criminal Procedure 24.3 (2024), to one count of theft by receiving a firearm and one count of possession of a controlled substance and received thirty-six months' probation. The

5

sentencing order was filed on June 17, 2024, and Thompson timely filed his notice of appeal. This appeal followed.

## II. *Standard of Review*

In reviewing a circuit court's denial of a motion to suppress, this court conducts a de novo review based on the totality of the circumstances, reviewing findings of fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings. *Yarbrough v. State*, 370 Ark. 31, 257 S.W.3d 50 (2007). Arkansas appellate courts defer to the superior position of the circuit court to evaluate the credibility of witnesses at a suppression hearing. *Ilo v. State*, 350 Ark. 138, 85 S.W.3d 542 (2002). We will reverse the denial of a motion to suppress only if the ruling is clearly against the preponderance of the evidence. *Id.*

## III. *Points on Appeal*

Thompson argues that (1) the circuit court erred by finding that the good-faith exception saved law enforcement's illegal seizure and subsequent illegal searches of both his person and residence, and (2) the circuit court clearly erred by denying the motion to suppress his custodial statements.

## IV. *Discussion*

### A. Good-Faith Exception

Thompson first argues that the circuit court erred by applying the good-faith exception to the exclusionary rule and holding that the evidence obtained pursuant to the warrantless searches and seizures were admissible. We disagree.

A warrantless search can be reasonable and thus constitutional, but a warrantless search is reasonable only if the search falls within a recognized exception to the Fourth Amendment's warrant requirement. *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141 (2013); *Dortch v. State*, 2018 Ark. 135, 544 S.W.3d 518. The good-faith exception, a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights, was clarified by the United States Supreme Court in *Leon*, 468 U.S. 897. However, the Court explained in *Groh v. Ramirez*, 540 U.S. 551 (2004), that the exception does not apply if law enforcement relies on a legal authority that is facially deficient or clearly lacking in specificity or probable cause.

In *Deshazo v. State*, this court held that the sheriff acted in good-faith reliance on a facially valid court order in executing an order of immediate possession. 95 Ark. App. 398, 237 S.W.3d 493 (2006). *Deshazo* involved the search of property that was rented to the appellant. The owner of the property issued a notice for Deshazo to vacate the premises, but Deshazo did not vacate; thus, an order for immediate possession and a writ of possession were filed and sent to Deshazo. *Id.* Thereafter, the sheriff's office served the order on Deshazo and informed him that he had a week to vacate the premises. When the officers returned to claim possession of the property, the individual who opened the door claimed that Deshazo was not home. The officers did a protective sweep outside and inside the residence

7

in search of Deshazo and, in the process, found weapons and what appeared to be drug paraphernalia. Accordingly, a warrant was issued—on the basis of the preliminary items found during the search of the home—and that evidence was used to convict Deshazo. Subsequently, it was determined that law enforcement failed to serve Deshazo with a writ of possession as required by statute and instead served him with an order of possession.

On appeal, this court held that for all practical purposes, the order of immediate possession and writ of possession accomplished the same thing and entitled the owner to possession of the property. *Id.* In applying the good-faith exception as outlined in *Leon*, the *Deshazo* court explained that while *Leon* involved a defective search warrant, the Supreme Court has extended the good-faith exception to a warrantless search permitted by a state statute that was later ruled unconstitutional, *Illinois v. Krull*, 480 U.S. 340 (1987); and to a search incident to an arrest that was based on erroneous information, *Arizona v. Evans*, 514 U.S. 1 (1995). *Deshazo*, 95 Ark. App. at 403, 237 S.W.3d at 497.

Accordingly, this court found no error in the circuit court's finding that the sheriff acted in good-faith reliance on a facially valid court order in executing the order of possession. *Id.* at 404, 237 S.W.3d at 497. Specifically, this court held that the sheriff "was of the understanding that he had complied with the statutory requirements, and when he returned . . . he believed he had the legal right to repossess the property for the plaintiff." *Id.* Considering the totality of the circumstances, this court held that suppressing the evidence in *Deshazo* would not serve the remedial purposes of the exclusionary rule. *Id.*

Here, law enforcement acted in reliance on an abatement order that was entered by a Craighead County Circuit Court in 2011 pursuant to the Arkansas Drug Abatement Act of 1989—an anti-drug law that allowed for the abatement of common nuisances, specifically targeting properties used for illegal drug activity. *See* Ark. Code Ann. §§ 16-105-401 et seq. (Repl. 2016). The purpose of the abatement order was crime prevention in the Cedar Heights neighborhood. Shortly thereafter, the City of Jonesboro posted signs throughout the Cedar Heights neighborhood that a person's presence within the abatement zone might subject the person to warrantless searches. The signs specifically state, "This property and all persons upon the property are subject to search by Jonesboro Police Department." The abatement order and signage remained unchallenged for nearly thirteen years until Thompson filed his motion to suppress.

Nonetheless, the circuit court was clear in its finding that the search of Thompson and the property were not authorized without a warrant merely because the abatement order gave the Jonesboro Police Department the authority to do so. In fact, the circuit court expressly rejected the State's argument to that effect:

> [T]he Fourth Amendment does not provide that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, may be violated if violated pursuant to an otherwise valid court order unless that court order also comports with the [w]arrant requirement.

Rather, the circuit court focused on whether Huff's actions were reasonable in light of the totality of the circumstances and the plain language of the abatement order.

In *Davis v. United States*, the Supreme Court reiterated that "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" 564 U.S. 229, 238 (2011) (quoting *Leon*, 468 U.S. at 919; *Herring v. U.S.*, 555 U.S. 135, 137 (2009)). Therefore, the specific facts of this case and Huff's actions on October 4, 2023, are equally important.

Before the date in question, Huff testified that he believed he saw a drug transaction take place at the residence via SkyCop. Huff also testified that the street-crime unit had several investigations centered on residents in the Cedar Heights neighborhood and that he had previously used his abatement authority to conduct searches of individuals within the abatement premises. Furthermore, Huff stated that he is familiar with Thompson, had previously arrested him in 2023, and had other various contacts with Thompson that did not ultimately result in an arrest.

When Huff's street-crime unit was patrolling the Cedar Heights neighborhood on October 4, 2023, he saw several males congregating outside the property. According to Huff's bodycam video, Huff immediately searched Thompson, and two oxycodone pills were seized. At the suppression hearing, Huff confirmed that it was standard practice of the Jonesboro Police Department to conduct searches of individuals based on the abatement order and that he had always been advised that conducting a search of a residence was also covered by the order. However, because Huff had never personally used the abatement order to search

a residence, he contacted the city attorney before conducting the search to confirm that he had such authority.

In light of these facts, we agree with the circuit court that Huff acted in good faith in relying on the clear directives of the abatement order. As stated by the circuit court, "Huff did exactly what courts expect of him in any court order, and the thirteen (13) years between the filing of that order and October 4, 2023 must have given Huff great confidence in its validity." We also agree that Huff's good faith was illustrated by his call to the city attorney to obtain legal advice as to the abatement order's scope before he executed a search of the residence. Furthermore, considering Huff's testimony regarding his personal knowledge of the ongoing criminal activity in the Cedar Heights neighborhood; familiarity with Thompson; observation of what he believed to be a prior drug transaction at the residence; and the longstanding reliance of the Jonesboro Police Department on the abatement order, we cannot say that Huff violated Thompson's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Thus, applying *Leon*'s reasoning to the specific facts of this case, we affirm the circuit court's denial of Thompson's motion to suppress.

B. Admission of Custodial Statements

Next, Thompson argues that the circuit court erred by denying his motion to suppress his statements claiming ownership of the stolen firearm. Thompson contends that the court erred by finding that his first statement—made at his residence while he was in custody and not yet given his *Miranda* warnings—was not a spontaneous statement but the result of a custodial interrogation; thus, the statement should have been suppressed. Alternatively,

11

Thompson maintains that his statement at the residence and his Mirandized statement the following day should have been suppressed because they were inexorably tied to his illegal arrest.

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). In cases involving a ruling on the voluntariness of a confession, this court makes an independent determination based on the totality of the circumstances. *Clark v. State*, 374 Ark. 292, 287 S.W.3d 567 (2008). We review the circuit court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by this court. *Id.* A circuit court's ruling will be reversed only if it is clearly against the preponderance of the evidence. *Id.* Furthermore, evaluating the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial statement is for the circuit court to determine, and we defer to the circuit court in matters of credibility. *Id.*

Here, the circuit court held that Thompson's first statement was admissible because it constituted a spontaneous statement, not a custodial interrogation. Further, the court found that the State met its burden of proof despite the fact that Thompson was in custody when he made the statement. A suspect's spontaneous statement while in police custody is admissible, and it is irrelevant whether the statement was made before

or after *Miranda* warnings because a spontaneous statement is not compelled or the result of coercion under the Fifth Amendment's privilege against self-incrimination. *Fricks v. State*, 2016 Ark. App. 415, 501 S.W.3d 853. A voluntary custodial statement does not become the product of an interrogation simply because an officer asks a defendant to explain or clarify something he or she already said voluntarily. *Connor v. State*, 2022 Ark. App. 375, 653 S.W.3d 37.

The circuit court explained that it "had the benefit of watching and hearing the entire interaction recorded on Huff's bodycam video" and that "it would strain credulity to even suggest that Huff's statement to the assembled masses was an unconstitutional custodial interrogation." Additionally, the court considered the fact that Thompson gave a post-*Miranda* statement the next day claiming ownership of the stolen firearm as further proof that his original statement was knowingly and intelligently made.

We hold that the circuit court's finding that Thompson's first statement constituted a spontaneous statement was not clearly against the preponderance of the evidence. After the firearm was seized, Huff announced to a large group of people, "I got a hot gun [and] everybody goes in cuffs . . . until I figure out whose gun it is." Amid the crowd and noise, Thompson said that the firearm belonged to him. However, Huff did not hear Thompson's statement. While Thompson was in custody at the time, he again claimed ownership of the seized firearm the following day after he had been arrested and Mirandized—and, as noted by the circuit court, expressed "some level of incredulity that

13

there was any question about that issue." Given the totality of the circumstances, we affirm the circuit court's finding that Thompson's original statement was voluntary and knowingly and intelligently made and, therefore, admissible.

Finally, Thompson argues that his statement claiming ownership of the firearm at the police station made after he had been properly Mirandized was inadmissible because it was tied to the illegal search and seizure or, alternatively, because his first statement was involuntary. However, because we affirm the circuit court's application of the good-faith exception to the warrant requirement and its finding that Thompson's original custodial statement constituted a spontaneous statement, both of Thompson's arguments regarding the inadmissibility of his second custodial statement must fail.

## V. *Conclusion*

For the above-stated reasons, we affirm the order denying Thompson's motion to suppress because the circuit court's order was not against the preponderance of the evidence.

Affirmed.

HIXSON and MURPHY, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen., for appellee.